# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| JUAN VANZZINI, et al., | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-11-4173 |
| | § | |
| ACTION MEAT DISTRIBUTORS, INC., | § | |
| et al., | § | |
| | § | |
| *Defendants*. | § | |

## MEMORANDUM AND ORDER

Pending before the Court in this Fair Labor Standards Act ("FLSA") collective action are Defendants Action Meat Distributors, Inc. and J. Fred Cramm's ("Defendants") Motion for Partial Summary Judgment on Applicability of the Federal Motor Carrier Act Exemption as to the Drivers ("MCA Summary Judgment Motion"; Doc. No. 62), Motion for Partial Decertification as to the Conditionally Certified Class ("Decertification Motion"; Doc. No. 63), and Motion for Summary Judgment as to the Claims of Juan Vanzzini ("Vanzzini Summary Judgment Motion"; Doc. No. 69). The Court believes that summary judgment regarding the Motor Carrier Act ("MCA") exemption to the requirements of the FLSA is warranted as to the claims of all of the drivers in the conditionally certified class except Rufus Flanagan. Thus, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' MCA Summary Judgment Motion. Further, the Court agrees with Defendants that, of the remaining members of the conditionally certified class, only Juan Vanzzini and Margarito Zavala are similarly situated. Therefore, the Court **GRANTS** Defendants' Decertification Motion. The Court is not convinced that summary judgment as to the claims of Plaintiff Juan Vanzzini is warranted, however; the Court **DENIES** Defendants' Vanzzini Summary Judgment Motion.

## I.  BACKGROUND

In December 2011, Plaintiff Juan Vanzzini filed this lawsuit against Defendants Action Meat Distributors, Inc. and J. Fred Cramm, its President, alleging violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201-219, and the Texas Labor Code, Tex. Lab. Code §§ 61.001-61.095. Defendants are and control a meat distribution company operating in Texas, Oklahoma, and Louisiana. Mr. Vanzzini was employed by Defendants as a "puller," and states that his job duties included filling customer orders and loading them onto trucks for delivery. Compl. ¶¶ 26, 28 (Doc. No. 1).  He contends that he was paid on an hourly basis, and regularly worked in excess of 40 hours per workweek without receiving overtime pay. Compl. ¶¶ 36–37.

Mr. Vanzzini seeks to represent a class of individuals whom he describes in the Complaint as:

> All current and former employees of any of the facilities owned or operated by Defendant in Texas who 1) worked at any business located in Texas that was owned, operated, controlled and/or acquired by Defendants during the class period, and 2) claims that he or she was either (a) deliberately misclassified as being exemptfrom the overtime pay provisions of 29 U.S.C., et.seq. or (b) failed to receive all or his or her overtime pay, in violation of 29 U.S.C., et.seq.and seeks payment for such lawfully earned.overtime pay.

Compl. ¶ 19.   The Court conditionally certified the class on July 12, 2012 and notice was approved and ordered on August 14, 2012. *See* Doc. No. 31. Notice was sent to potential class members, and fourteen individuals opted-in to the class. *See* Doc. Nos. 28, 30, 32-38. As of this date, six have withdrawn their consent to participate, *see* Doc. Nos. 41 and 64, leaving Juan Vanzzini, Rodolfo Calderón, Rufus Flanagan, Ricardo López, Luis F. Molano, Mario José Roque, Yolanda Salazar, and Margarito Zavala as potential class members.[1]

---

[1] In their Decertification Motion, Defendants assert that Plaintiffs have represented to them that Maria Cereza, who has opted in to the class, *see* Doc. No. 33, would be withdrawing her consent to participate in the collective action. However, to date, Ms. Cereza has not done so, even though, in their briefing, Plaintiffs do not contest Defendants' assertion. Neither of the parties has submitted briefing or evidence, either in support of, or in opposition to, Ms.

On the dispositive motions deadline, and after the close of discovery, Defendants sought leave to amend their answer to include the affirmative defense of the Motor Carrier Act's statutory exemption to the FLSA's requirements. *See* Doc. No. 42. The Court ultimately allowed Defendants to amend their complaint over the strong, and continuing, objection of the Plaintiffs. *See* Doc. No. 48. In order to alleviate prejudice to the Plaintiffs, the Court allowed them several months of additional discovery relating to the new defense. *Id.* Following the close of that discovery period, the Defendants filed these motions, seeking summary judgment, both as to the MCA exemption and as to Mr. Vanzzini's claims, and decertification of the conditionally certified class.

## II. SUMMARY JUDGMENT MOTIONS

### A.  Legal Standard

Under Federal Rule of Civil Procedure 56, summary judgment is warranted if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Importantly, "the mere existence of *some* factual dispute will not defeat a motion for summary judgment; Rule 56 requires that the fact dispute be *genuine* and *material*." *Willis v. Roche Biomed. Lab.*, 61 F.3d 313, 315 (5th Cir. 1995). Material facts are those whose resolution "might affect the outcome of the suit under the governing law . . . ." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving

---

Cereza's continuing participation in this suit. Nevertheless, Defendants have moved for decertification; Plaintiffs bear the burden of showing why the class members are similarly situated. *Maynor v. Dow Chem. Co.*, 671 F. Supp. 2d 902, 931 (S.D. Tex. 2009) (citing *Proctor v. Allsups Convenience Stores, Inc.*, 250 F.R.D. 278, 280 (N.D. Tex. 2008)). Plaintiffs, however, have supplied the Court with nothing to show that Ms. Cereza is similarly situated to any of the other class members. Consequently, Plaintiffs have not satisfied their burden, and the Court will dismiss her claims without prejudice.

party." *Id.* (citing *Anderson*, 477 U.S. at 248). A court may consider any evidence in the record, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). However, conclusory affidavits will not suffice to create or negate a genuine issue of fact. *Reese v. Anderson*, 926 F.2d 494, 498 (5th Cir. 1991); *Shafer v. Williams*, 794 F.2d 1030, 1033 (5th Circ. 1986); *see* Fed. R. Civ. P. 56(c)(4).

The moving party bears the burden of demonstrating that there is no genuine dispute as to any material fact, but it need not negate the elements of the nonmoving party's case. Fed. R. Civ. P. 56(a); *Willis*, 61 F.3d at 315 (citing *Celotex*, 477 U.S. at 322-23); *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005). If the burden of proof at trial lies with the nonmoving party, the moving party may satisfy its initial burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. However, "[i]f the moving party fails to meet [its] initial burden, the motion must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

Once the moving party has met its burden, the nonmoving party must come forward with specific evidence in order to raise a genuine issue of material fact. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). Simply resting on the allegations in the pleadings will not suffice. Neither will this burden be satisfied "by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075). In deciding a summary judgment motion, the court must draw all reasonable inferences in the light most favorable to the

4

nonmoving party. *Anderson*, 477 U.S. at 255; *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

### B.  MCA Summary Judgment Motion

#### 1. The Propriety of Allowing Defendants' Amended Answer

Plaintiffs first argue that summary judgment should be denied because Defendants' amendment of their answer to include the MCA exemption as an affirmative defense was untimely and should not be permitted under Federal Rule of Civil Procedure 8. Even though it previously decided to allow the amendment, Doc. No. 48, the Court will take up Plaintiffs' arguments. They are, however, unavailing.

Federal Rule of Civil Procedure 8 requires that, "[i]n responding to a pleading, a party must affirmatively state any avoidance or affirmative defense . . . ." Fed. R. Civ. P. 8(c)(1). Failure to do so may waive the defense. *Rogers v. McDorman*, 521 F.3d 381, 385 (5th Cir. 2008). However, the Fifth Circuit has determined that this rule admits of some flexibility. *Id.* According to the Fifth Circuit, failure to plead an affirmative defense may be excused so long as "the [affirmative defense] is raised in the trial court in a manner that does not result in unfair surprise." *Id.* at 385-86 (quotation marks and citation omitted). If the defense "is raised at a pragmatically sufficient time, and the plaintiff was not prejudiced in its ability to respond," the Fifth Circuit "generally will not find the defense waived." *Solomon v. Spalitta*, 484 F. App'x 883, 884-85 (5th Cir. 2012) (citing *McDorman*, 521 F.3d at 385-86) (internal quotation marks omitted). Here, however, it is not the case that Defendants raised the MCA exemption for the first time outside of their pleadings. Rather, Defendants sought leave to amend their pleadings before raising the defense. Thus, the proper question is whether the Court was correct in

allowing such an amendment when it did, after the close of discovery and the deadline for dispositive motions.[2]

The touchstone in this inquiry is Federal Rule of Civil Procedure 16(b), which, the Fifth Circuit has determined, controls requests to amend pleadings coming after the deadline set in the scheduling order. *S&W Enters., L.L.C. v. SouthTrust Bank of Alabama, NA*, 315 F.3d 533, 536 (5th Cir. 2003). Rule 16(b) provides that a scheduling order "may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). The good cause standard "requires the 'party seeking relief to show that the deadlines cannot reasonably be met despite the diligence of the party needing the extension.'" *S&W Enters.*, 315 F.3d at 535 (quoting 6A Charles Alan Wright et al., *Federal Practice and Procedure* § 1522.1 (2d ed. 1990)). In deciding whether to allow an untimely amendment of the pleadings, the Fifth Circuit looks to the following factors: "(1) the explanation for the failure to [timely move for leave to amend]; (2) the importance of the [amendment]; (3) potential prejudice in allowing the [amendment]; and (4) the availability of a continuance to cure such prejudice." *Id.* at 536 (quoting *Reliance Ins. Co. v. La. Land & Exploration Co.*, 110 F.3d 253, 257 (5th Cir. 1997) (internal quotation marks omitted)). "In the context of a motion for leave to amend, the court may deny the motion if the movant 'knows or should have known of the facts upon which the proposed amendment is based but fails to include them in the original complaint.'" *Mobius Risk Grp., LLC v. Global Clean Energy Holdings, Inc.*, No. H-10-1708, 2012 WL 527939 at *6 (S.D. Tex. Feb. 16, 2012) (quoting *Pallottino v. City of Rio Rancho*, 31 F.3d 1023, 1027 (10th Cir. 1994)).

---

[2] Even if analyzed under Rule 8, however, Defendants' Amended Answer was proper. There is no dispute that it was raised late. Additionally, that it came at the close of discovery and at the dispositive motions deadline undoubtedly surprised Plaintiffs. However, it was not raised on the eve of trial, nor was it raised at a point at which any prejudice to the Plaintiffs could not be remedied. Indeed, Plaintiffs were allowed several more months to conduct discovery before the Court required them to answer Defendants' motions for summary judgment and decertification.

Once good cause under Rule 16(b) has been shown, Rule 15(a) governs. Under Rule 15(a), courts "should freely give leave when justice so requires," and, according to the Fifth Circuit, leave "should be granted absent some justification for refusal." *U.S. ex rel. Willard v. Humana Health Plan of Texas Inc.*, 336 F.3d 375, 386 (5th Cir. 2003). This underlying policy provides the court with "broad discretion" in determining whether to grant leave to amend. *Id.* Thus, a motion for leave to amend should not be denied unless there is "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed [or] undue prejudice to the opposing party by virtue of allowance of the amendment . . . ." *Id.* (internal quotation marks omitted) (quoting *Foman v. Davis*, 371 U.S. 178, 182, 83 S. Ct. 227, 230, 9 L. Ed. 2d. 222 (1962)).

In this case, a revised scheduling order was issued at a hearing on December 11, 2012. It set January 15, 2013 as the deadline for all amendments to pleadings.[3] Doc. No. 39. Defendants' motion seeking to amend their answer was filed roughly five months later on June 28, 2013. Thus, Rule 16(b) governs. Application of the Fifth Circuit's four factor test shows that there was good cause to allow modification of the scheduling order, and, for the same reasons, that the amendment was properly allowed under Rule 15. The first factor is the only one which cuts against the Defendants. At the July 11, 2013 hearing at which Defendants' motion for leave to amend the pleadings was discussed, Defendants offered two reasons for their delay: 1) that they did not finish discovery until early June, 2013; and 2) that they had a relatively short period in which to amend their answer. Hr'g Tr. 4-7, July 11, 2013 (Doc. No. 59). While neither of these

---

[3] There is a lack of clarity in the record as to the exact date amended pleadings were due when Defendants filed their motion for leave to amend their answer. At the December 11, 2012 hearing, in response to a motion seeking a revised scheduling order, the Court affirmatively set trial for September 30, 2013, and ordered that the Joint Pretrial Order be submitted by September 23, 2013 and that all dispositive motions be filed by June 28, 2013. While the motion under consideration at that hearing sought, among other things, to set January 15, 2013 as a revised deadline for amended pleadings, the Court did not explicitly order that date. However, whether it is the revised January 15, 2013 date, or the original deadline of June 1, 2012, it is clear to the Court that Defendants' motion for leave to amend their answer was several months late.

answers is particularly persuasive, the balance of the other factors is. The Court believes the amendment was important, because preventing Defendants from asserting this defense may have led to recovery by employees who are actually exempt from recovery under the FLSA. Next, while Plaintiffs undoubtedly would be prejudiced if they were prevented from conducting discovery on this defense, such prejudice could be, and was, cured by a continuance to allow that discovery. When the Court allowed Defendants to amend their answer, it also allowed Plaintiffs additional time for discovery and later extended that time even further. *See* Doc No. 48; Hr'g Tr. 21, August 19, 2013 (Doc. No. 57). For the same reasons, the Court believes leave to amend was properly granted under Rule 15. With the propriety of Defendants' amendment of their answer to include the MCA exemption decided, the Court turns to the merits of Defendants' motion for summary judgment.

### 2. The MCA Exemption

#### a.  Statutory and Regulatory Framework

Enacted in 1938, the FLSA requires covered employers, among other things, to compensate nonexempt employees at overtime rates for time worked in excess of statutorily defined maximum hours. 29 U.S.C. § 207. The FLSA provides a right of action for employees against employers who violate this requirement, 29 U.S.C. § 216, and it also details several classes of employees who are exempt from the requirement. 29 U.S.C. § 213.

The "Motor Carrier Act exemption," codified at 29 U.S.C. § 213(b)(1), exempts certain employees with transportation-related jobs from the requirements imposed upon conditions of employment by the FLSA. Section 13(b)(1) of the FLSA explicitly exempts "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of Title 49." 29 U.S.C. §

213(b)(1). Section 31502 of Title 49 of the United States Code grants the Secretary of Transportation the authority to set requirements for qualifications and maximum hours of certain employees of motor carriers and motor private carriers described in 49 U.S.C. §§ 13501 and 13502. As relevant here, those provisions grant the Secretary of Transportation jurisdiction over "transportation by motor carrier and the procurement of that transportation, to the extent that passengers, property, or both, are transported by [a] motor carrier" between "a State and a place in another State." 49 U.S.C. §§ 13501, 13501(1)(A).[4] The policy behind this exemption, promoting road and highway safety, is weighty. *See Levinson v. Spector Motor Serv.*, 330 U.S. 649, 680, 67 S. Ct. 931, 947, 91 L. Ed. 1158 (1947); *United States v. Am. Trucking Ass'ns*, 310 U.S. 534, 553, 60 S. Ct. 1059, 1069, 84 L. Ed. 1345 (1940).

Under the Department of Labor's regulations implementing the MCA exemption, the applicability of the exemption "depends both on the class to which his employer belongs and on the class of work involved in the employee's job." 29 C.F.R. § 782.2(a). According to the regulations, the Secretary of Transportation has the power to establish maximum hours and qualifications of employees who: "(1) [a]re employed by carriers whose transportation of passengers or property by motor vehicle is subject to his jurisdiction under section 204 of the Motor Carrier Act, and (2) engage in activities of a character directly affecting the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in interstate or foreign commerce within the meaning of the Motor Carrier Act." *Id.* (internal citations omitted).

As the Fifth Circuit has interpreted this statutory and regulatory scheme, "[t]o be subject to the Secretary of Transportation's jurisdiction pursuant to the MCA, a motor carrier must be

---

[4] "Motor carrier" is defined as "a person providing motor vehicle transportation for compensation." 49 U.S.C. § 13102(14).

engaged in interstate commerce." *Songer v. Dillon Res., Inc.*, 618 F.3d 467, 472 (5th Cir. 2010). "[D]rivers subject to [Department of Transportation ("DOT")] requirements, are employed in positions that affect the operational safety of motor vehicles." *Id.* at 473 (quotations and citations omitted) (citing *Barefoot v. Mid-America Dairymen, Inc.*, 826 F. Supp. 1046, 1050 (N.D.Tex. 1993), *aff'd*, 16 F.3d 1216 (5th Cir. Feb. 18, 1994)). Some factors that courts in the Fifth Circuit consider in determining whether the employees are drivers subject to DOT requirements include: whether drivers maintain DOT log books that record time driving; whether drivers must pass DOT written and driving tests; whether drivers must undergo DOT physical and drug tests; whether the drivers need to meet DOT and Federal Motor Carrier Safety Regulations ("FMCSR") qualifications in order to drive; whether drivers are required to have a valid commercial driver's license; whether drivers receive a compilation of applicable regulatory information; whether drivers participate in a program reviewing those regulations; and whether drivers complete FMCSR vehicle inspection reports. *See id.* at 473-76 (citing *Barefoot v. Mid-America Dairymen, Inc.*, 826 F. Supp. at 1050); *Allen v. Coil Tubing Services, L.L.C.*, 846 F. Supp. 2d 678, 696 (S.D. Tex. 2012). Importantly, for the MCA exemption to apply, the Fifth Circuit has determined that the Secretary of Transportation "need only *possess* the power to regulate the employees at issue; it *need not actually exercise* that power." *Songer* 618 F.3d at 472 (citing *Barefoot v. Mid-America Dairymen, Inc.*, 16 F.3d 1216, *2 (5th Cir. Feb. 18, 1994)) (emphasis added).

The parties have brought to the Court's attention two legislative interventions which also impact the Court's analysis of the MCA exemption. The first is the Safe Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users, Pub. L. No. 109-59, 119 Stat. 1144 (2005) ("SAFETEA-LU"). The SAFETEA-LU amended the definitions of "motor carrier" and

"motor private carrier" to refer to "commercial" motor vehicles. The act defined the term

"commercial motor vehicle" as a

> self-propelled or towed vehicle used on the highways in interstate commerce to transport passengers or property, if the vehicle—
>
> (A) has a gross vehicle weight rating or gross vehicle weight of at least 10,001 pounds, whichever is greater;
> (B) is designed or used to transport more than 8 passengers (including the driver) for compensation;
> (C) is designed or used to transport more than 15 passengers, including the driver, and is not used to transport passengers for compensation; or
> (D) is used in transporting material found by the Secretary of Transportation to be hazardous under section 5103 of this title and transported in a quantity requiring placarding under regulations prescribed by the Secretary under section 5103.

*Id.* § 4142, 119 Stat. at 1747 (citing 49 U.S.C. § 31132).

Almost three years later, Congress enacted the SAFETEA-LU Technical Corrections Act

of 2008, Pub. L. No. 110-244, 122 Stat. 1572 (2008) ("TCA"). The TCA removed "commercial

motor vehicle" from the "motor carrier" and "motor private carrier" definitions. *Id.* § 305(c), 122

Stat. at 1620. But, the TCA also provided that FLSA's overtime pay requirements "shall apply"

to a "covered employee" notwithstanding the MCA exemption. *Id.* § 306(a), 122 Stat. at 1620.

The TCA defines a "covered employee" to include an individual:

> (1) who is employed by a motor carrier or motor private carrier . . . and
> (2) whose work, in whole or in part, is defined—
>        (A) as that of a driver, driver's helper, loader, or mechanic; and
>        (B) as affecting the safety of operation of motor vehicles weighing 10,000 pounds or less in transportation on public highways in interstate or foreign commerce . . . and
> (3) who performs duties on motor vehicles weighing 10,000 pounds or less.

*Id.* § 306(c), 122 Stat. at 1621. In so doing, the TCA both restored the scope of the Secretary of

Transportation's regulatory jurisdiction to what it was prior to the enactment of SAFETEA-LU,

*and* simultaneously narrowed the scope of the MCA exemption. The result is that, following

11

SAFETEA-LU and the TCA, an employee of a motor carrier or a motor private carrier who works with motor vehicles weighing less than 10,000 pounds may be entitled to overtime compensation as provided in the FLSA.

### b.  Application

Defendants have provided competent and uncontroverted summary judgment evidence that Defendant Action Meat Distributors, Inc. ("Action Meat") is a carrier subject to the jurisdiction of the Secretary of Transportation, thereby satisfying the first prong of 29 C.F.R. § 782.2(a). Affidavit of Ernest Thomas Shelley, Jr. ¶¶ 4-5, June 24, 2013 (Doc. No. 62-1).

The regulation's second prong requires a more fact-intensive inquiry. Defendants provide sufficient evidence to establish that all of the drivers who have opted into the class either actually were, or could have been, given assignments to drive across state lines; had valid commercial driver's licenses; received the relevant regulations, including the FMCSR; and were required to log their time driving, to make pre-trip DOT inspections, and to undergo drug tests. Shelley Aff. ¶ 5 (Doc. No. 62-1); Excerpts of the Deposition of Rodolfo Calderón 14-17, June 8, 2013 (Doc. No. 62-4); Excerpts of the Deposition of Rufus Flanagan 9, 20-23, May 24, 2013 (Doc. No. 62-2); Excerpts of the Deposition of Ricardo López 19-24, June 8, 2013 (Doc. No. 62-5); Excerpts of the Deposition of Luis F. Molano 12, 21-24, 28, 35, May 24, 2013 (Doc. No. 62-3); Excerpts of the Deposition of Mario José Roque 7, 13-16, 23, June 8, 2013 (Doc. No. 62-6). Significantly, Plaintiffs do not contest that these drivers were subject to DOT requirements during the periods covered by this lawsuit. The Court is persuaded that the drivers were employees subject to the jurisdiction of the Secretary of Transportation, as detailed in the MCA and its accompanying regulations.

However, after the SAFETEA-LU and TCA amendments, truck weight can be dispositive because the TCA carved out from the MCA exemption those drivers working with trucks weighing less than 10,000 pounds. This is where the parties' chief dispute lies. Defendants have produced a sworn affidavit from Thomas Shelley, Action Meat's Operations Manager, which states that all of Action Meat's trucks weigh more than 10,001 pounds. Shelley Aff. ¶ 7 (Doc. No. 62-1). If this is true, then the drivers fall squarely into the MCA exemption.

Plaintiffs offer two points in response. First, based on copies of rental receipts from Defendants' truck vendors (presumably Doc. Nos. 54-6 - 54-8, though Plaintiffs never directly cite them), they argue that Action Meat rented trucks weighing less than 10,000 pounds. They acknowledge that Defendants have claimed that these vehicles were for personal use, Pl's Resp. in Opp'n to Defs.' Mot. for Partial Summ. J. 9 (Doc. No. 67); Doc. No. 54-1, but contend that this factual dispute must be left to a jury for resolution. The Court believes that this evidence is insufficient to defeat summary judgment. Without evidence that the drivers involved in this case, or even Action Meat drivers in general, actually drove those trucks, the Court is not convinced that the Plaintiffs have raised a genuine issue of material fact.

Second, Plaintiffs argue that the deposition testimony from Scott Rago, Action Meat's Transportation Manager, demonstrates that drivers working for Action Meat used vehicles weighing less than 10,000 pounds for business activities. In his deposition, Mr. Rago testified that some drivers would occasionally use his personal truck (which Defendants do not dispute weighs under 10,000 pounds) for business-related purposes. *See* Doc. No. 65-1. Although they did not do so when it was previously introduced, Defendants now object to the Court's consideration of this deposition testimony on the ground that it constitutes hearsay because it was not properly authenticated. Defendants are correct that the excerpt lacks the certifications that

would typically accompany a properly authenticated deposition transcript. Nevertheless, the Court will credit the transcript excerpt, because Defendants provide no reason for the Court to doubt the purported excerpt's authenticity. Additionally, while somewhat thin, there are several indicia of reliability. For one, the transcript includes objections from opposing counsel that would not normally appear in other writings. Plaintiffs' counsel represents that it is such, and name both the deponent and the date the deposition was taken. Defendants do not suggest that the excerpt is another kind of writing, or that it has been altered in any way.

Attached to their Reply, Defendants supply an affidavit from Mr. Rago in which he states that four of the five drivers who have opted-in to this collective action – Mr. Molano, Mr. Calderón, Mr. López, and Mr. Roque – could not have used his truck, because they were not employed by Action Meat at the same time as he. *See* Affidavit of Scott Rago ¶ 3, Nov. 22, 2013 ("Rago Affidavit"; Doc. No. 71-1). The Court finds these unsupported assertions by Mr. Rago, submitted only with Defendants' Reply, somewhat self-serving, particularly as Defendants have the employment records which could conclusively document when the drivers worked for Action Meat. Nevertheless, the Court will credit these assertions, as they are corroborated by the drivers' own depositions. Mr. Rago states that he began working at Action Meat in September, 2011. *Id.* ¶ 2. In his deposition, Mr. Molano stated that he left Action Meat in 2009, roughly two years before Mr. Rago began working there. Excerpts of the Deposition of Luis F. Molano 8, May 24, 2013 (Doc. No. 63-8). Mr. Calderón and Mr. Roque both stated that their supervisors while employed by Action Meat were "Pablo" and "David" – not Scott Rago. Excerpts of the Deposition of Rodolfo Calderón 13, June 8, 2013 (Doc. No. 63-9); Excerpts of the Deposition of Mario José Roque 13, June 8, 2013 (Doc. No. 63-11). Similarly, Mr. López stated that his

supervisors were "David" and "Tom." Excerpts of the Deposition of Ricardo López 20, June 8, 2013 (Doc. No. 63-10).

Mr. Rago concedes that he and Rufus Flanagan, the fifth driver who has opted-in to this collective action, both worked at Action Meat at the same time, but Mr. Rago states unequivocally that Mr. Flanagan never drove his truck. Rago Aff. ¶ 3. Mr. Flanagan's deposition corroborates the assertion that they worked together at Action Meat. Not only does Mr. Flanagan report beginning his employment at Action Meat in July, 2011 and concluding it in December, 2011, he also affirmatively names Mr. Rago as one of his supervisors. Excerpts of the Deposition of Rufus Flanagan 12-13, 28, May 24, 2013 (Doc. No. 63-7). The Court finds the unsupported assertion that Mr. Flanagan never drove Mr. Rago's truck self-serving as well, and, without more, the Court finds it insufficient to show that there are no issues of material fact with respect to this matter.

Therefore, the question is whether the deposition testimony from Mr. Rago that some drivers used his personal truck for business-related purposes is sufficient to prevent summary judgment as to Mr. Flanagan's claims. This is a close question, but, taking all inferences in favor of the non-movant, the Court believes that it is. Mr. Rago testified that he would occasionally ask some drivers to use his personal truck for business-related matters.  Doc. No. 65-1. Mr. Flanagan testified in his deposition that his assignments changed daily. Flanagan Depo. at 21-22 (Doc. No. 63-7). It is entirely reasonable then, to infer that Mr. Flanagan may have been given an assignment to complete a business-related task using Mr. Rago's personal vehicle. While an inference is required to arrive at this conclusion, the summary judgment mechanism requires the Court to draw all reasonable inferences in the light most favorable to the non-moving party, which is Plaintiffs here. *Anderson*, 477 U.S. at 255; *Connors v. Graves*, 538 F.3d 373, 376 (5th

Cir. 2008). Thus, the Court believes that summary judgment as to Mr. Flanagan is not appropriate. The Court is persuaded, however, that summary judgment is warranted as to the other drivers.

### C.  Vanzzini Summary Judgment Motion

By a separate motion, Defendants argue that Juan Vanzzini's claims should be dismissed because he has not properly consented to representing the class. Defendants do not entirely explain their argument, but they seem to contend that Mr. Vanzzini has not submitted a written consent to join the collective action, which would toll the applicable limitations period. As a result, the argument goes, the statute of limitations has run with respect to Mr. Vanzzini's claims (regardless of whether the limitations period is two years or three), because Mr. Vanzzini stopped working at Action Meat in December 2010. Affidavit of Juan Vanzzini, Dec. 14, 2011 ("Vanzzini Affidavit"; Doc. No. 10-1). Therefore, Defendants contend, summary judgment is appropriate.

Plaintiffs respond, first, that Mr. Vanzzini has indeed provided written consent to join the collective action, in his affidavit submitted along with the Motion for Class Certification, and, in the alternative, that the Court may still allow him to file a notice of consent, in an exercise of equitable tolling. In addition, Plaintiffs also contend that Mr. Vanzzini brings the suit both in his individual capacity and as representative of the putative class. For the reasons stated below, the Court concludes that Mr. Vanzzini's affidavit is sufficient.

The FLSA's requirements are plain. In authorizing collective actions, Section 16 of the FLSA states that, "[n]o employee shall be a party plaintiff to any [FLSA collective action] unless he gives his consent in writing to become such a party *and* such consent is filed in the court in which such action is brought." 29 U.S.C. § 216(b) (emphasis added). An FLSA collective action

16

is to be considered "commenced" for statute of limitations purposes when a plaintiff's written consent to become a party plaintiff is filed with the court. 29 U.S.C. § 256.

A central question facing the Court, then, is not *whether* Mr. Vanzzini must file a written consent in order to comply with the statute's requirements, but what *form* such a consent must take in order to be effective. While the statute makes it clear that named plaintiffs must supply something in addition to their complaint, the statute does not specify what form the written consent must take. Under Fifth Circuit precedent, "little more is needed than a statement indicating intent to participate and a signature . . . ." *Lima v. Int'l Catastrophe Solutions, Inc.*, 493 F. Supp. 2d 793, 802 (E.D. La. 2007) (citing *Montalvo v. Tower Life Bldg.*, 426 F.2d 1135, 1148-49 (5th Cir. 1970)).

The Court believes that the question of whether Mr. Vanzzini's affidavit constitutes effective written consent "is a close one, and one which would not have arisen had [Mr. Vanzzini's] counsel simply ensured that a written consent form was filed along with the complaint." *D'Antuono v. C & G of Groton, Inc.*, No. 3:11CV33 MRK, 2012 WL 1188197, at *4 (D. Conn. Apr. 9, 2012). Nevertheless, despite this failure, the Court is persuaded that Mr. Vanzzini's affidavit is sufficient. While the affidavit generally concerns Mr. Vanzzini's allegations regarding insufficient overtime compensation, it explicitly, in both English and Spanish, states in the caption that Mr. Vanzzini brings the action along with "all others similarly situated," and Mr. Vanzzini signed it, attesting that all within it is true. Further, it was filed in support of a Motion for Class Certification, and Mr. Vanzzini has submitted to a deposition. *See* Excerpts of the Deposition of Juan Vanzzini, Jan. 22, 2013 ("Vanzzini Deposition"; Doc. No. 63-5). While not dispositive, these latter facts support a conclusion that, in affirming in his affidavit that he brought the action along with "all others similarly situated," Mr. Vanzzini

consented to participate in the collective action. *See D'Antuono*, 2012 WL 1188197, at *4. ("[A] declaration attached to a motion for class certification may bolster a plaintiff's argument that the declaration was meant to serve as a notice of consent . . . [T]he Court finds that the fact that [the plaintiff] has already willingly undergone a lengthy deposition relevant in the evaluation of whether [he] intended to participate in this case."). The Court therefore concludes that summary judgment as to Mr. Vanzzini's claims is not warranted.

## III. DECERTIFICATION MOTION

### A.  Legal Standard

Under Section 7 of the FLSA, covered employers are required to compensate nonexempt employees at overtime rates for time worked in excess of statutorily defined maximum hours. 29 U.S.C. § 207(a). Section 16 of the FLSA provides a right of action for employees against employers who violate Section 7. It also permits "[a]n action . . . against any employer . . . by any one or more employees for and in behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b). In contrast to class actions proceeding under Federal Rule of Civil Procedure 23, Section 16 also establishes an 'opt-in' framework under which plaintiffs must affirmatively notify the court of their intention to become parties to the suit; by doing so, they may benefit from a judgment. *See Ackal v. Centennial Beauregard Cellular L.L.C.*, 700 F.3d 212, 216 (5th Cir. 2012); *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1212 (5th Cir. 1995); *Maynor v. Dow Chemical Co.*, 671 F. Supp. 2d 902, 930 (S.D. Tex. 2009).[5]

Courts generally recognize two methods for determining whether to certify a class of similarly situated employees in this context: the spurious class action *Shushan* approach, or the two-step *Lusardi* approach. *Aguirre v. SBC Comms., Inc.*, No. H-05-3198, 2006 WL 964554, at

---

[5] *Mooney* was an action under the Age Discrimination in Employment Act ("ADEA"). Nevertheless, it is instructive here because the ADEA explicitly incorporates Section 16(b) of the FLSA to likewise provide for an 'opt-in' collective action procedure for similarly situated employees. *See Mooney*, 54 F.3d at 1212.

*4 (S.D. Tex. April 11, 2006) (citing *Shushan v. Univ. of Colo. at Boulder*, 132 F.R.D. 263 (D. Colo. 1990); *Lusardi v. Xerox Corp.*, 118 F.R.D. 351 (D.N.J. 1987)). The Fifth Circuit has not determined which method is more appropriate, *Mooney*, 54 F.3d at 1216, but most courts within the Fifth Circuit, including the one, use the *Lusardi* approach. *Aguirre*, 2006 WL 964554, at *4. *See also Johnson v. Big Lots Stores, Inc.*, Nos. 04-3201, 05-6627, 2007 WL 5200224, at *3 (E.D. La. Aug. 21, 2007) ("Since *Mooney* district courts in the Fifth Circuit have uniformly used [the *Lusardi* approach] to determine whether a collective [action] should be certified under the FLSA.").

Under the first step of the *Lusardi* analysis, courts decide whether to issue notice to potential class members. *Aguirre*, 2006 WL 964554, at *5. Specifically, "[t]he first-stage test requires a minimal showing by the plaintiff that (1) there is a reasonable basis for crediting the assertions that aggrieved individuals exist, (2) that those aggrieved individuals are similarly situated to the plaintiff in relevant respects given the claims and defenses asserted, and (3) that those individuals want to opt-in to the lawsuit." *Id.* at *6; *Albanil v. Coast 2 Coast, Inc.*, No. H-08-486, 2008 WL 4937565, at *6 (S.D. Tex. Nov. 17, 2008) (quoting *Maynor v. Dow Chemical Co.*, No. G-07-0504, 2008 WL 2220394, at *6 (S.D. Tex. May 28, 2008)). As a court's decision at this first step is usually based only on the pleadings and affidavits, the standard is lenient and typically results in conditional certification. *Aguirre*, 2006 WL 964554, at *5 (citing *Mooney*, 54 F.3d at 1214 n. 8) Once a court conditionally certifies a class, the case proceeds as a collective action during discovery. *Id.* (citing *Mooney*, 54 F.3d at 1214).

At the second stage of the analysis, after discovery is largely completed, a defendant may move to "decertify" the conditionally certified class. *Id.* (citing *Lusardi*, 188 F.R.D. at 359). The court then must make a factual determination as to whether the employees are actually similarly

situated; only if it so finds may the collective action proceed. *Id.* (citing *Mooney*, 54 F.3d at 1214; *Basco v. Wal-Mart Stores, Inc.*, No. 00–3184, 2004 WL 1497709, at *3 (E.D. La. July 1, 2004)). Alternatively, if the court finds that the employees are *not* similarly situated, the opt-in plaintiffs are dismissed without prejudice to bringing their own actions, and the original plaintiffs may proceed with their individual claims. *Id.* (citing *Mooney*, 54 F.3d at 1214; *Basco*, 2004 WL 1497709, at *3; *England v. New Century Fin. Corp.*, 370 F. Supp. 2d 504, 508 (M.D. La. 2005)).

The decision whether to decertify a collective action is within a district court's discretion. *See Mooney*, 54 F.3d at 1213 ("[T]he district court's application of the [legal] standard must be reviewed for abuse of discretion."); *Pendlebury v. Starbucks Coffee Co.*, 518 F. Supp. 2d 1345, 1348-49 (S.D. Fla. 2007). While the plaintiffs must show that they are "similarly situated," courts are adamant that this does not mean they must establish that the plaintiffs are "identically situated." *Basco*, 2004 WL 1497709, at *5 (citing *Crain v. Helmerich and Payne Int'l Drilling Co.*, No. 92-0043, 1992 WL 91946, at *2 (E.D. La. 1992)). Rather, the relevant inquiry is whether there is "a demonstrated similarity among the individual situations . . . some factual nexus which binds the named plaintiffs and the potential class members together as victims of a particular alleged [policy or practice,]" so that hearing the cases together furthers the purposes of Section 16, is fair to both parties, and does not result in an unmanageable trial. *Crain*, 1992 WL 91946, at *2 (internal quotation marks omitted) (quoting *Heagney v. European Am. Bank*, 122 F.R.D. 125, 127 (E.D.N.Y. 1998)); *see Simmons v. T-Mobile*, No. H-06-1820, 2007 WL 210008, at * 8 (S.D. Tex. Jan. 24, 2007) (there must be "meaningful 'identifiable facts or legal nexus [that] bind the claims'") (quoting *Aguirre*, 2006 WL 964554, at *5); *Hill v. Muscogee Cnty. Sch. Dist.*, No. 4:03-CV-60 (CDL), 2005 WL 3526669, at *3 (M.D. Ga. Dec. 20, 2005) ("At the core of the 'similarly situated' inquiry is the question whether the issues in the case can be

20

adjudicated collectively."); *Olivo v. GMAC Mortg. Corp.*, 374 F. Supp. 2d 545, 548 n. 2 (E.D. Mich. 2004) (noting that, at step two, the court would consider "whether certification would serve the purposes of a collective action under § 216(b), and then weigh the benefits of a collective action against the prejudice to the defendant and any judicial inefficiencies that could result from allowing Plaintiffs to proceed collectively." (internal citations omitted)).

Thus, courts generally consider the following factors when determining whether a lawsuit should proceed collectively: (1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to the defendant which appear to be individual to each plaintiff; and (3) fairness and procedural considerations. *Mooney*, 54 F.3d at 1213 n. 7, 1215-16 (citing *Lusardi*, 118 F.R.D. at 359); *Anderson v. Cagle's, Inc.*, 488 F.3d 945, 953 (11th Cir. 2007) (quoting *Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1105 (10th Cir. 2001)); *Wilks v. Pep Boys*, No. 3:02-0837, 2006 WL 2821700, at *3 (M.D. Tenn. Sept. 26, 2006); *Basco*, 2004 WL 1497709, at *4.

The presence of a common policy, plan, or practice affecting all putative class members, although not required, can be helpful in assessing the first factor, concerning the plaintiffs' factual and employment settings. *Falcon v. Starbucks Corp.,* 580 F. Supp. 2d 528, 535 (S.D. Tex. 2008) (collecting cases). With regard to the second factor, addressing individualized defenses, courts are concerned with whether representative evidence can be used to make class-wide determinations and the extent to which resolution "requires such individualized inquiries that the case cannot proceed collectively." *Roussell v. Brinker Int'l, Inc.*, No. CIV.A. H-05-3733, 2008 WL 2714079, at * 21 (S.D. Tex. July 9, 2008) (citing *Johnson v. Big Lots Stores, Inc.*, Nos. 4-3201, 05-6627, 2008 WL 2488629, at *17-18 (E.D. La. June 20, 2008)). In evaluating the third factor, regarding fairness and procedural considerations, courts "must consider the primary

objectives of a collective action: (1) to lower costs to the plaintiffs through the pooling of resources; and (2) to limit the controversy to one proceeding which efficiently resolves common issues of law and fact that arose from the same alleged activity." *Mahoney v. Farmers Ins. Exch.*, No. 4:09-CV-2327, 2011 WL 4458513, at *10 (S.D. Tex. Sept. 23, 2011) (citing *Johnson v. TGF Precision Haircutters, Inc.*, No. H03–3641, 2005 WL 1994286, at *7 (S.D. Tex. Aug. 17, 2005)). At the same time, a court "must also determine whether it can coherently manage the class in a manner that will not prejudice any party." *Id.* (internal quotation marks omitted) (quoting *Johnson v. TGF Precision Haircutters, Inc.*, 2005 WL 1994286, at *7).

The step two standard is "less 'lenient'" and at least one Circuit has concluded that the "similarities necessary to maintain a collective action under § 216(b) must extend 'beyond the mere facts of job duties and pay provisions.'" *Anderson v. Cagle's, Inc.*, 488 F.3d at 953 (citing *White v. Osmose, Inc.*, 204 F. Supp. 2d 1309, 1314 (M.D. Ala. 2002)). Decertification is proper if "the action relates to specific circumstances personal to the plaintiff rather than any generally applicable policy or practice." *Mahoney*, 2011 WL 4458513, at *4 (internal quotation marks omitted) (quoting *Burt v. Manville Sales Corp.*, 116 F.R.D. 276, 277 (D. Colo. 1987)). In fact, "the more material distinctions revealed by the evidence, the more likely the district court is to decertify the collective action." *Anderson v. Cagle's, Inc.*, 488 F.3d at 953.

Nevertheless, the Court is mindful that the FLSA is a *remedial* statute, and should be construed broadly. *See, e.g.*, *Reich v. Circle C. Investments, Inc.*, 998 F.2d 324, 329 (5th Cir. 1993) (recognizing FLSA's remedial purposes); *Prickett v. DeKalb Cnty.*, 349 F.3d 1294, 1296 (11th Cir. 2003) ("FLSA is a remedial statute that has been construed liberally to apply to the furthest reaches consistent with congressional direction." (internal citations omitted)). Indeed, the Supreme Court has itself recognized, that in allowing collective actions, Congress intended to

give "plaintiffs the advantage of lower individual costs to vindicate rights by the pooling of resources." *Hoffmann-LaRoche Inc. v. Sperling*, 493 U.S. 165, 170, 110 S. Ct. 482, 486, 107 L. Ed. 2d 480 (1989). This Court fully understands that plaintiffs can "hardly be expected to pursue these small claims individually, so there is little likelihood that their rights will be vindicated in the absence of a collective action." *Bradford v. Bed Bath and Beyond*, 184 F. Supp. 2d 1342, 1351 (N.D. Ga. 2002); *see Pendlebury*, 518 F. Supp. 2d at 1363 (noting that "Defendant's suggestion that few Plaintiffs would re-file is the precise reason Congress authorized class action treatment for these types of cases."). Although, by itself, the FLSA's remedial nature does not justify allowing a case to proceed collectively, as this Court has previously concluded, "it does at least suggest that a close call as to whether Plaintiffs are similarly situated should be resolved in favor of certification." *Falcon*, 580 F. Supp. 2d at 541.

### B.  Analysis

As an initial matter, those drivers as to whom the Court granted summary judgment regarding the MCA exemption are no longer in the class because they are exempt employees. Therefore, remaining in the class are: Rufus Flanagan, Yolanda Salazar, Juan Vanzzini, and Margarito Zavala. Defendants argue that, apart from Mr. Vanzzini and Mr. Zavala, those individuals remaining in the class are not similarly situated within the meaning of the *Lusardi* analysis, and thus the class should be partially decertified. Plaintiffs oppose the motion, contending that, with respect to the elements relevant to the *Lusardi* analysis, all of the conditionally certified class members are indeed similarly situated.

The parties agree that Juan Vanzzini and Margarito Zavala are similarly situated, and the Court is satisfied that they are properly included in the class. First, both are "pullers," who were responsible for preparing customer orders for delivery. Vanzzini Depo. at 26; Excerpts of the

Deposition of Margarito Zavala 28-29, Jan. 24, 2013 ("Zavala Deposition"; Doc. No. 63-6). They would pull boxes of meat product from the warehouse shelves, arrange them on pallets, and move them to the front of the warehouse when they were ready to be delivered. Affidavit of Ernest Thomas Shelley, Jr. ¶ 5, June 24, 2013 (Doc. No. 63-2); Vanzzini Depo. at 26; Zavala Depo. at 28-29. Secondly, because they both worked in the same physical location, the warehouse, they not only shared similar job duties, they also shared supervisors. Vanzzini Depo. at 22, 27; Zavala Depo. at 24. Importantly, both received hourly wages, worked regular shifts, and recorded when they began and ended work by punching a time clock. Shelley Aff. ¶ 6 (Doc. 63-2); Vanzzini Depo. at 21-22, 24, 27-30; Zavala Depo. at 22, 28-33. Defendants do not argue any individualized defenses with respect to these two potential class members. Finally, the remedial and judicial economy reasons underwriting the FLSA's collective action approach are apparent in a class including these two workers. Because these similarities make their claims susceptible to representative evidence, including them in the class will not only lower their costs through the pooling of resources, but it will enable the Court to efficiently resolve the common issues of law and fact relating to their overtime compensation in one joint proceeding.

The Court is not persuaded that the remaining opt-in class members, Mr. Flanagan and Ms. Salazar, are similarly situated to anyone else in the class, however. First, their work duties diverged widely not only from each other, but also from those of the pullers. Mr. Flanagan was a driver. As a driver, Mr. Flanagan drove trucks, generally delivering meat products to Defendants' customers. Flanagan Depo. at 20-22 (Doc. No. 63-7); Shelley Aff. ¶ 5 (Doc. No. 63-2). He was required to abide by DOT regulations, including keeping a logbook, and had to satisfy a number of prerequisites prior to being hired. Flanagan Depo. at 20, 22-23, 26-27 (Doc. No. 63-7); Shelley Aff. ¶ 5 (Doc. 63-2). This is in direct contrast to the pullers, who were not

24

expected to have any particular training when they were hired. Shelley Aff. ¶ 5 (Doc. No. 63-2); Vanzzini Depo. at 20-21. Generally, drivers do not even enter the warehouse, where the pullers both worked. Flanagan Depo. at 33 (Doc. No. 63-7); Vanzzini Depo. at 26, 54. Importantly, with respect to hours and payment provisions, Mr. Flanagan states that, again, unlike the pullers, he was paid by the trip, not by the hour, and that his hours varied by the trip. Flanagan Depo. at 21-22, 24-27, 33-34 (Doc. No. 63-7); Shelley Aff. ¶ 6 (Doc. No. 63-2). Finally, it seems that Mr. Flanagan brings different claims than the pullers. Along with any overtime compensation claims, Mr. Flanagan appears also to seek relief for alleged violations of DOT driving rules. Flanagan Depo. at 7, 36 (Doc. No. 63-7).

Similarly, Ms. Salazar was employed to clean Defendants' homes and offices.[6] Excerpts of the Deposition of Yolanda Salazar, May 15, 2013 at 22, 24, 34 ("Salazar Deposition"; Doc. No. 63-12). Thus, she worked neither in the Defendants' trucks, like the drivers, nor in the warehouse, like the pullers. Salazar Depo. at 32-33, 47. While she worked regular shifts, she was paid a flat weekly rate, rather than an hourly rate. *Id.* at 32-34, 42. Taken together, these differences suggest that, as a group, these employees' claims are not susceptible to proof through representative evidence. In other words, the potential class members lack a factual nexus tying them together; these disparate factual and employment settings strongly suggest that all of the potential class members were not subjected to a common decision, policy, or plan.

Second, Defendants have legitimate individualized defenses with respect to at least one of the putative class members. While the evidence available was not sufficient to grant summary judgment for the reasons explained above, Defendants may still put on evidence to demonstrate that the MCA exemption applies to Mr. Flanagan, which they may not do with respect to any of

---

[6] Significantly, Ms. Salazar was not identified by either Defendants or Plaintiffs as an employee falling within the class definition. Rather, she learned about this lawsuit from a relative, and then decided to opt-in. Salazar Depo. at 30.

the other remaining opt-in class members. The kind of highly factual, individualized inquiry that determining whether the MCA exemption applies to Mr. Flanagan would require in the wake of the Court's decision on Defendants' MCA Summary Judgment Motion counsels against including him in the certified class.

Finally, there are a total of four potential class members remaining. While certainly not dispositive, there is a vast difference between granting decertification regarding a potential class of hundreds, or even dozens, and thereafter facing as many individual suits, and granting decertification regarding two potential class members. While combining even two cases together will likely conserve both Plaintiffs' expenses and judicial economy, such benefits are only realized when the cases are *similarly situated*. Here, they are not – it is not at all clear that combining all of these plaintiffs' claims in one action would actually "efficiently resolve[] common issues of law and fact that arose from the same alleged activity." *Mahoney*, 2011 WL 4458513, at *10.

For these reasons, the Court finds that Defendants' motion is well-taken. The Court believes that certification of a class consisting of the pullers – Mr. Vanzzini and Mr. Zavala – is warranted. However, the Court finds that Mr. Flanagan and Ms. Salazar are not similarly situated, either to the pullers, or to each other. Their claims will be dismissed from this suit, though they may pursue them in separate actions.

## IV. CONCLUSION

For the reasons stated in this memorandum, Defendants' Motions are **GRANTED IN PART** and **DENIED IN PART**. The MCA Summary Judgment Motion is **GRANTED IN PART** and **DENIED IN PART**. The Court finds that there are no genuine issues of material fact with respect to the exempt status of all of the drivers except Rufus Flanagan; as to their claims,

summary judgment is **GRANTED**. The Court believes that the Plaintiffs have raised a genuine issue of material fact with respect to Mr. Flanagan's claims, and therefore summary judgment is **DENIED** as to his claims. The Partial Decertification Motion is **GRANTED**. Juan Vanzzini and Margarito Zavala will be allowed to proceed as a class. The claims of the remaining potential class members, Rufus Flanagan and Yolanda Salazar, are **DISMISSED WITHOUT PREJUDICE**, as are those of Maria Cereza. Finally, because the Court has concluded that Mr. Vanzzini's affidavit manifests an intention to participate in the collective action, the Vanzzini Summary Judgment Motion is **DENIED**. Thus, those plaintiffs remaining in the conditionally certified class are Juan Vanzzini and Margarito Zavala.


     **IT IS SO ORDERED.**

     **SIGNED** at Houston, Texas on this the thirty-first day of January, 2014.


                                      _____

                                      KEITH P. ELLISON
                                      UNITED STATES DISTRICT JUDGE